# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| MICHAEL LING, ET AL | § | |
| | § | |
| vs. | § | Case No. 4:05CV345 |
| | § | (Judge Brown/Judge Bush) |
| DEUTSCHE BANK AG, ET AL. | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Before the Court is Plaintiffs' Motion to Remand. Having considered the motion, the various responses, and Plaintiffs' reply, the Court is of the opinion that the motion to remand should be granted.

Plaintiffs initially brought this action in the 219th Judicial District of Collin County, Texas. The Original Petition alleges that a tax avoidance strategy was developed, marketed, and implemented by the various named defendants which resulted in significant tax liability to Plaintiffs. The investment strategy required Plaintiffs to open securities brokerage accounts with Deutsche Bank Securities, Inc. (D/B/A and hereinafter referenced as "Deutsche Bank Alex. Brown"), a domestic corporation, by signing account agreements. The agreements contained arbitration clauses. The strategy, referred to as an "MLD" (i.e., foreign currency Market-Linked Deposit), required Plaintiffs to open individual accounts with Deutsche Bank Alex. Brown for the purpose of purchasing long and short currency options. In addition, Defendants formed an LLC on behalf of Plaintiffs, which was made up of Plaintiffs and another entity created solely for the transaction.

Plaintiffs entered into contracts with Deutsche Bank Alex. Brown to buy and sell long and short digital currency option, which would expire between 60 and 90 days from the date of

purchase. The options were similar to bets, in the sense that Plaintiffs were "betting" that the value of a foreign currency would be either higher or lower than a certain number at a specific time on a specific date in the future. The long option included a deposit identical to the deposit included in the short option, and the cost of the long option position was, in most cases, largely, if not entirely, offset by the amount received for the short position. This was accomplished because the strike price on the two options were generally only hundredths of a point apart, leaving Plaintiffs little chance to land in the "sweet spot" between the strike prices.

After purchasing the options but before they expired, the Plaintiffs would contribute their long and short MLD positions to the LLC. The Plaintiffs would also contribute cash and other assets to the LLC and would receive Class A units of the LLC in exchange for their contributions. The Plaintiffs would then contribute their Class A units to an S Corporation, causing the Plaintiffs to withdraw from the LLC and the S Corporation to be admitted as a member. When the options expired, a gain or loss would result depending on the exchange rate. The S Corporation would next purchase the members' Class B units, effectively terminating the LLC for income tax purposes and allowing the S Corporation to take an adjusted basis in the LLC's remaining assets. Finally, the LLC would sell its remaining assets and, since the LLC is a disregarded entity for income tax purposes, the sale would lead to a substantial short-term or ordinary capital loss to the S Corporation, and thus to the individual Plaintiffs. The losses were then used to offset Plaintiffs' unrelated capital gains and ordinary income tax obligations, resulting, at the time, in tax savings for the Plaintiffs.

The Plaintiffs agreed to engage in the above transactions at various times throughout the

summer of 2001. Then, on October 14, 2003, Plaintiffs learned that the IRS was taking the position that the MLD transactions were neither valid nor legal. Plaintiffs claim that they were never informed that the tax shelter at issue may not be legal, but were told that it was legal and would result in substantial tax savings. Plaintiffs hired new tax and legal advisors and incurred substantial additional costs and expenses. In fact, Plaintiffs claim they were required to amend their tax returns for 2001 and pay substantial additional taxes, interest, and penalties.

Originally, Plaintiffs filed a class action in the United States District Court for the Southern District of New York entitled *Ling, et al. v. Deutsche Bank AG, et al.*, No. 04-CV-4566. Plaintiffs alleged various common law claims and a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiffs' RICO claims were dismissed on May 26, 2005, and Plaintiffs were given leave to file a third amended complaint. However, rather than amend their New York complaint, Plaintiffs filed this action on July 26, 2005 in the 219th District Court of Collin County, Texas. Defendants removed to this Court on August 26, 2005. On September 22, 2005, Plaintiffs moved to remand the action to state court.

Defendants base removal on two separate grounds. First, Defendants argue that removal is appropriate pursuant to 28 U.S.C. § 1441 because, although Plaintiff brings no federal claims, Defendants contend that the resolution of Plaintiffs' state law claims depends upon the resolution of substantial and disputed federal issues. Defendants further claim that removal is appropriate pursuant to 9 U.S.C. § 205, claiming that an arbitration agreement at issue falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the Convention"). *See* 9 U.S.C. 201, *et seq.* The Court will address each of the grounds in turn.

**Substantial Federal Issue**

While Defendants may generally remove an action if the federal court would have original jurisdiction, a removing party bears the burden of proving that federal jurisdiction exists. *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995). Furthermore, removal statutes are construed strictly in favor of remand. *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002). As all parties concede that complete diversity is lacking, and as Plaintiffs have brought no federal claims, the Court must determine whether, as Defendants contend, federal question jurisdiction exists pursuant to 28 U.S.C. § 1331 because at least one of Plaintiffs claims "necessarily raises a stated federal issue, *actually disputed and substantial*, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 125 S. Ct. 2363 (2005) (emphasis added).

Plaintiffs have brought claims against the various Defendants for declaratory judgment, breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, professional malpractice, unjust enrichment, unethical, excessive and illegal fees, and civil conspiracy. Defendants argue that Plaintiffs' claims are dependent upon a determination of whether the MLD shelters were consistent with federal tax law. Further, Defendants contend that the federal interest in the interpretation and application of federal tax law does not depend on whether the IRS is a party to the dispute. Plaintiffs argue that there are no disputed issues of federal tax law, as the IRS has now enacted its opinions as regulations. Plaintiffs further argue that, as they have settled their claims with the IRS, there is no dispute as to whether or not Plaintiffs are entitled to the tax

benefits at issue.

Generally, courts apply the well-pleaded complaint rule when determining if federal jurisdiction exists. *Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014, 1017 (5th Cir. 1993). Under the rule, removal is only appropriate if the Plaintiffs' "well-pleaded complaint" raises issues of federal law sufficient to support federal jurisdiction. *Id.* The Plaintiff is thus the "master of the claim" and may avoid federal jurisdiction by exclusive reliance on state law. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). However, state law claims "arising under" federal law may be heard pursuant to § 1331 when they "turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 125 S. Ct. 2363, at 2367 (2005). The exercise of federal jurisdiction over state claims requires not only a substantial federal issue, but a contested one. *Id.* However, even when such an issue exists, courts must yet consider issues "regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 8 (1983). Therefore, in order for a federal court to exercise jurisdiction over a state-law claim, the claim must: (1) necessarily raise a disputed and substantial federal issue, (2) be such claims that "a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable* 125 S. Ct. at 2368 .

As to the first element, Plaintiffs contend that the federal tax notices at issue are now regulations and are therefore not in dispute. Furthermore, Plaintiffs argue that they clearly do not

dispute the regulations since they have now been assessed taxes, interest, and penalties and have paid the assessments. Plaintiffs concede that they are not entitled to the tax benefits they were told they would receive. Rather, Plaintiffs contend that Defendants are liable for the torts enumerated in the complaint because they developed the illegal tax shelter and inaccurately assured Plaintiff's that it was legal.

Since *Grable*, a number of district courts have been faced with similar issues and, with the exception of one, all Courts have found removal to be improper. *See Sheridan v. New Vista, LLC*, 2005 WL 2090898 (W.D. Mich. Aug. 30, 2005) (finding removal improper in case involving similar, if not identical, tax shelter); *Maletis v. Perkins & Co.*, No. CV-05-820-ST (D. Or. Sept. 13, 2005) (finding removal improper in case involving identical tax shelters, similar issues, and the Deutsche Bank Defendants); *Becnel v. KPMG LLP*, 2005 WL 2016246 (W.D. Ark June 1, 2005) (fining removal proper in case involving tax shelters); *Cantwell v. Deutsche Bank Sec., Inc.* No. 3:05-CV-1378-D (N.D. Tex. Sept. 21, 2005) (finding removal improper in case involving identical tax shelters, similar issues, and the Deutsche Bank Defendants); *Harold Acker v. AIG Intern'l, Inc.* No. 05-22072-CIV (S.D. Fla. Nov. 7, 2005) (remand granted in case involving similar tax shelter). The Court finds *Grable* to be distinguishable from the present case. In *Grable*, the meaning of the statute was the central issue, whereas in this case, the validity of the tax strategy is merely one facet of Plaintiffs' claims. *See Sheridan*, 2005 WL at *4. Furthermore, unlike *Grable*, the Plaintiffs in the present case do not call the interpretation of tax law into question, but rather question Defendants' interpretation of the law and whether Defendants should have known the shelter was invalid. *See Id.* Plaintiffs concede that the IRS

6

notices at issue were valid, and as they have since been enacted as regulations, they have the authority of law. The Court finds that Defendants have failed show that any of Plaintiffs' claims raise a disputed and substantial federal issue.

Regarding the second element, the Court agrees with the *Sheridan* Court that the implications of federal jurisdiction in this type of case is much broader than in *Grable*. *See Id.* Were district courts to exercise jurisdiction each time an issue of federal law was present in a state malpractice, contract, or tort claim, the federal courts would be overburdened with litigation that should properly be decided in state court.[1] Permitting cases such as this to be removed would not only defeat the purpose of the well-pleaded complaint doctrine, but would open the floodgates to numerous cases which do not belong in the federal forum.

Although no party has addressed the issue, the Court notes that Plaintiffs refer to federal law twice in their petition. In Plaintiffs' eighth claim, at paragraph 271, they request declaratory judgment pursuant to 28 U.S.C. § 2201. *See* Pls. Pet. at pg. 106. Then, in the corresponding damages paragraph, Plaintiffs request that damages for the eighth claim be "trebled under RICO." *See* Pls. Pet. at pg. 109. However, the Court notes that Plaintiffs have stated no RICO or other federal claims–and no party contends otherwise. Furthermore, § 2201 cannot serve as an independent basis for federal jurisdiction--an underlying basis for federal jurisdiction must exist. *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980). As Plaintiffs petition spans 111 pages and nearly 300 paragraphs, and as Plaintiffs have previously attempted to file this action, including

---

[1] Virtually any state substantive case could have potential federal implications. For example, many state tort cases have medicare liens asserted against a possible settlement or recovery.

a RICO claim, in New York federal court, the Court will assume that the references to federal law were inadvertently included. No party contends, and the Court does not find, that Plaintiffs explicitly stated federal claims. As the Court further finds that no disputed and substantial matters of federal law are at issue, removal is inappropriate pursuant to § 1441.

## The Convention

Defendants next argue that the case was properly removed pursuant to 9 U.S.C. § 205, as the case involves an arbitration agreement covered by the Convention. In order for removal to be proper under § 205, Defendants must show that (1) an arbitration agreement exists which "falls under" the Convention; and (2) the dispute "relates to" the arbitration agreement. *Beiser v. Weyler*, 284 F.3d 665, 666 (5th Cir. 2005). Whether a commercial agreement exclusively between United States citizens falls under the agreement is determined by § 202, which states, in pertinent part:

> An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed *not* to fall under the Convention *unless* that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

9 U.S.C. § 202 (emphasis added).

The first issue before the Court is whether the arbitration agreement "falls under" the Convention. In order for an arbitration agreement to "fall under" the Convention, it must either be a commercial agreement involving at least one party who is not a citizen of the United States, or must: (1) involve property located abroad; (2) envisage performance abroad; or (3) have some

other reasonable relationship with one or more foreign states. *See Id.* The parties concede that the agreement is commercial in nature. The only parties to the arbitration agreement at issue seem to be Plaintiffs and Deutsche Bank Alex. Brown, all of whom are United States citizens. Therefore, the Court finds the agreements to be entirely between United States citizens in spite of Defendants' argument that the parent of Deutsche Bank Alex. Brown, Deutsche Bank AG, is a German citizen.

No party argues that the relevant agreements involved property located abroad. While the contracts involved options for foreign currency, the options were more like "bets" on the value of foreign currency at a particular time on a particular date. There is no evidence or argument that foreign currency was ever actually purchased pursuant to the agreements.

Defendants do argue, however, that agreements "fall under" the convention because the parties' relationship envisaged performance abroad. Defendants argue that, throughout the petition, Deutsche Bank Alex. Brown, the domestic corporation which was a party to the agreement, is mentioned interchangeably with Deutsche Bank AG, a German corporation, and that Plaintiffs allege that the two entities engaged in concerted misconduct. Furthermore, Defendants argue that the MLD strategy envisioned trades implemented by Deutsche Bank AG and that Deutsche Bank AG's London branch served as a counter-party to trades with certain Plaintiffs. Defendants further argue that the account agreements authorize Deutsche Bank Alex. Brown to "purchase Foreign Securities...from or sell Foreign Securities...to an affiliate of Deutsche Bank AG." *See* Account Agreements, Notice of Removal, Exs. 4-22.

As noted in *Maletis*, although the account agreements authorize Deutsche Bank Alex.

Brown to purchase and sell foreign securities to Deutsche Bank AG affiliates, the purpose of the agreements was to enable Plaintiffs to buy options on foreign currency, which are essentially "bets" as to the future value of such currency. *See Maletis,* CV-05-820-ST at 10. The options did not require the actual purchase of foreign currency or securities, and the options were purchased domestically. While, in what appears to be a form contract, Plaintiffs allow for the purchase of foreign securities, the purpose of the agreement was clearly not so broad, and there is no indication that the parties ever envisaged performance abroad. And, as noted by Plaintiffs, no performance actually occurred abroad. Furthermore, the Court does not find that granting Deutsche Bank Alex. Brown permission to purchase and sell foreign securities to a Deutsche Bank AG affiliate, who may or may not be a foreign entity considering that Deutsche Bank Alex. Brown, a domestic corporation, is a Deutsche Bank AG affiliate, necessarily envisages performance abroad. Defendants have not made a sufficient showing that such transactions, in the digital age, could not take place domestically.

Neither is the Court persuaded by Defendants' argument that performance is envisaged abroad because Deutsche Bank Alex. Brown is a subsidiary of Deutsche Bank AG. Though a subsidiary, Deutsche Bank Alex. Brown is a separate, domestic entity. Deutsche Bank Alex. Brown, and not Deutsche Bank AG, signed the agreement in the United States, which was drafted on Deutsche Bank Alex. Brown letterhead, and which required the application of New York law. The Court finds Deutsche Bank Alex. Brown's relationship to Deutsche Bank AG to be irrelevant to this inquiry.

Defendants next argue that the fact that Deutsche Bank AG's London Branch was listed

as counter-party on a number of transactions means that performance was envisaged abroad. However, these transactions appear to have taken place entirely within the United States, with United States currency, in the New York branch of Deutsche Bank AG London. Defendants have neither argued nor shown that any performance actually occurred in London. The Court finds that the parties never intended or even envisaged, that any performance related to the agreement at issue would take place abroad. For the Court to find otherwise would mean that any corporation could gain federal jurisdiction by simply inserting a clause into its domestic contracts requiring arbitration and permitting performance abroad, regardless of how unlikely such performance was.

Defendants do not argue that the agreements envisage enforcement abroad, which arguments would fail as the agreements require arbitration before the New York Stock Exchange or National Association of Securities Dealers Regulation, Inc. and the application of New York Law. The next inquiry before the Court, then, is whether the agreements "ha[ve] some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. Defendants argue that the agreements are reasonably related to a foreign state because they require Plaintiffs to arbitrate with "you" which is defined to include Deutsche Bank AG affiliates, many of whom, including Deutsche Bank AG, are foreign entities. Furthermore, Defendants reiterate their argument that Deutsche Bank AG London was a counter-party to certain trades.

The Convention applies to an arbitration agreement between two United States citizens "provided there is a 'reasonable relation' between the parties' commercial relationship and some 'important foreign element.'" *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 340 (5th Cir. 2004) (citations omitted) (finding an agreement was reasonably related to another

11

foreign state when the performance at issue involved pipefitting services on barges in West Africa). Defendant's cite some non-controlling authority in support of their position, but the Court finds the authority to be inapplicable to the present case. In *Hansen v. KPMG, LLP, et al.* No. CV 04-10525-GLT (C.D. Cal. March 29, 2005), although the facts are unclear, the court found the agreement to fall under the convention because Plaintiff apparently borrowed millions of dollars directly from Deutsche Bank AG in order to purchase foreign securities. Defendants also cite *Chew v. KPMG, LLP, et al.*, No. 3:04cv748BN (S.D. Miss. Jan. 6, 2005), but the Court finds this case to be inapplicable to the present analysis as it clearly involved property located abroad. *See Chew*, No. 3:04cv748BN at 10 (noting that the tax strategy at issue involved a direct investment in Deutsche Bank AG stock and an indirect investment, through and offshore trading entity, in Deutsche Bank AG stock). Defendants do not even argue that the present case involves foreign property.

The Court finds no reasonable relationship between the agreement at issue and any foreign state or element. The mere fact that Deutsche Bank Alex. Brown is a subsidiary of a foreign entity is of little consequence since the domestic subsidiary, rather than the foreign entity, was the signatory and party to the agreements. Furthermore, no evidence has been submitted that any of the transactions, even if Deutsche Bank AG London was listed as a counter-party, reasonably relate to England, Germany, Japan, or any other foreign state. The transactions took place entirely within the United States. United States law was applicable to the agreements and arbitration was to take place before domestic entities. Any relationship to any foreign state is attenuated, at best, but certainly not reasonable. The Court finds that the agreements at issue do not fall under the

Convention. Defendants have also cited *Beiser v. Weyler*, 284 F.3d 665 (5th Cir. 2002) to support their proposition that the present cause of action "relates to" the arbitration agreement. However, the parties in *Beiser* did not dispute that the agreement at issue fell under the convention. *Beiser*, 284 F.3d at 666. As the Court finds that the agreements at issue do not "fall under" the convention, it need not discuss whether the cause of action relates to the arbitration agreements.

## **RECOMMENDATION**

Based upon the foregoing, the Court recommends that Plaintiffs' Motion to Remand be GRANTED and that the above titled and numbered cause of action be REMANDED to the 219th District Court of Collin County, Texas.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 23rd day of November, 2005.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE